IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2022 Session

## STATE OF TENNESSEE v. DEMARIO QUINTEZ DRIVER

**Direct Appeal from the Circuit Court for Cheatham County**
**No. 17834     David D. Wolfe, Judge**

---

### No. M2021-00538-CCA-R3-CD

---

A Cheatham County jury convicted the Defendant, Demario Quintez Driver, of rape and coercion of a witness, and the trial court sentenced him to sixteen years in the Tennessee Department of Correction.  On appeal, the Defendant asserts that the evidence is insufficient to support his conviction for rape and that the State's closing argument amounted to prosecutorial misconduct.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Winston P. Vaughn, Pleasant View, Tennessee (at trial): and Michael J. Flanagan, Nashville, Tennessee (on appeal), for the appellant, Demario Quintez Driver.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Margaret F. Sagi, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant's attack and rape of the victim inside the bathroom at a gathering in a residential home.  For his actions, a Cheatham County grand jury indicted him for aggravated rape.  Before trial, the Defendant contacted the victim and offered her compensation in exchange for not testifying.  He also threatened harm to her family if she followed through with the prosecution.  Based on this conduct, a Cheatham County grand jury indicted the Defendant for coercion of a witness.

## A. Trial

The following evidence was presented at the Defendant's trial: Kim Freeze testified that the victim was her daughter and lived with her in March of 2016. On March 20, 2016, the twenty-one-year-old victim came home to Ms. Freeze's house from a party in a vehicle that Ms. Freeze did not recognize. Ms. Freeze described the victim as "really messed up," and the victim said someone had "done something" to her. The victim was crying and said her truck had been stolen. The victim was "walking funny" and had bruises on her lips, neck, and arms. The victim showed Ms. Freeze her vagina, which Ms. Freeze described as "awful" looking, as if it had been "ripped." The victim took a nap but did not shower or bathe, and Ms. Freeze took the victim to the hospital the next day.

The victim testified that she was twenty-one years old in March of 2016 and living with her mother. She drove a 2007 GMC Sierra truck at that time. On March 19, 2016, the victim drove in her truck with a friend to the home of Greg Sanders. They arrived around 11 p.m. Present at the residence were Mr. Sanders, the Defendant, and about a dozen other individuals. The victim spoke with several people at the gathering, including the Defendant, whom she identified in the courtroom and described as an acquaintance. The Defendant asked to drive her truck and she told him "no." The victim stated that she consumed three alcoholic drinks at the gathering over the course of an hour and a half and that the Defendant prepared the third drink for her. The victim testified that, after the third drink, she began feeling "dizzy and woozy." The victim went into a bedroom to collect herself and use the bathroom. As the victim was using the toilet, the Defendant came into the bathroom with a "smirk" on his face. The victim's pants were not on completely, and she was dizzy. As she tried to pull up her pants, the Defendant grabbed her, and she had "no strength" to fight him off. The Defendant knocked her over and put his penis in her mouth. The victim testified that she "faded out" soon after.

The victim regained consciousness in a closet and, when someone knocked on the door, the Defendant grabbed her face to cover her mouth. The victim recalled that her pants and the Defendant's pants were both off. She recalled "glimpses" of the Defendant putting his penis in her mouth without her consent. The victim lost consciousness again and then awoke to Mr. Sanders putting her into his bed. The victim was missing half of her clothing and her remaining clothes were ripped. Money that she kept in her undergarments had been taken. Her truck was also missing, along with money, prescription medication, and personal items inside the truck. The victim testified that her mouth was sore, and her vagina felt as if it had been "ripped to pieces." The victim stated that she was terrified. Mr. Sanders gave her some clothes and then the victim arranged for a ride home. The victim described herself as in a "daze," but eventually she went to the hospital where a rape kit was performed. The victim testified that she was "ripped" and bleeding and felt as if someone had "pounded" her and "ran through" her.

The victim testified that she contacted law enforcement about this incident and that she was terrified. She stated that she had been threatened several times and offered money or drugs not to testify at trial. The Defendant sent the victim a message offering to return the money and items in her truck that had been taken from her.

On cross-examination, the victim testified that she had been to Mr. Sanders's house several times prior to March of 2016. The victim was shown a series of Facebook messages she exchanged with the Defendant on the day after the rape, March 21, 2016. The victim summarized the messages, saying that she was asking the Defendant for her money and medicine and her truck to be returned to her. The victim said she was "extremely angry and distraught" when sending the messages. She agreed that she proposed meeting the Defendant to get her things back but stated that she did not plan to go alone. She agreed that she sent the messages before going to the hospital following the rape.

On redirect-examination, the victim stated that, throughout the messages, the Defendant denied being involved in the victim's rape; however, the victim testified that DNA from her vagina and her rectum showed that he had in fact had intercourse with her. The victim stated that Mr. Sanders and the Defendant were associated with a violent group of people and that she was scared of both men. Mr. Sanders was murdered in December of 2016. She testified that Mr. Sanders's DNA was also found in her vagina following the rape. She reiterated that she had no memory of having sexual relations with either man.

The victim clarified that the rape occurred at approximately 4 a.m. on March 20, 2016, and that the messages she exchanged with the Defendant were sent around 2 p.m. on March 21. The victim described this incident as a "gang rape" and detailed the suffering she had experienced since the rape.

Walter Bammen testified that he was employed by the Cheatham County Sheriff's Office in March of 2016. While off duty on March 20, 2016, Lieutenant Bammen observed the victim's truck parked on the side of the road in a rural area across from his church. Two days later, while on duty, Lieutenant Bammen learned that the truck had been reported as stolen, and he arranged for it to be towed from the roadside. The vehicle was checked for fingerprints when it arrived at the tow-in lot at the Sheriff's office.

Detective Jeff Landis testified that he worked as a criminal investigator for the Cheatham County Sheriff's Office and processed the victim's truck at the tow-in lot. Detective Landis obtained fingerprints from the driver's side door and window, which were later sent to the Tennessee Bureau of Investigation ("TBI"). Testing revealed two matches to the fingerprints: the victim and the Defendant.

Sherry Mulbarger testified that she was a registered nurse working at TriStar

Medical Center in Ashland City, Tennessee, on the night the victim presented at the hospital. Ms. Mulbarger examined the victim and noted injuries to her vagina: "Swelling," "tenderness," and redness. Ms. Mulbarger stated that the victim's rectum had "mild lacerations" at the top and bottom of the rectal opening and that the victim was sore and bleeding. The victim was described as tearful, angry, depressed, and afraid for her and her family's safety. The victim's chart contained the following account of the rape:

> "[The victim was] [r]aped at a party 48 hours ago. A man she had knowledge of followed her into the bathroom and raped her. [The victim] [r]epeatedly told the man to stop, blacked out, awoke in closet, does not remember going to closet. Came out at approximately 2:00 p.m. Told mother [about] rape, did not want police contacted, was afraid."

Dr. Brenda Reilly testified that she was an emergency room physician working at the hospital when the victim presented on March 22, 2016. Dr. Reilly performed a rape kit on the victim and noted that the victim's genitalia was swollen, red, and tender. These findings were consistent with the victim's report that she had unsolicited sexual contact. Dr. Reilly described the victim as anxious, tearful, uncomfortable, and upset. Dr. Reilly testified that the victim had lacerations on her genitalia consistent with forcible penetration of that area.

TBI Special Agent Lisa Burgee conducted the DNA testing in this case. She testified that the Defendant's DNA was present in the victim's vaginal swab. An unidentified contributor's DNA was detected and Agent Burgee later determined that the DNA contributor was Mr. Sanders.

TBI Special Agent April Bramlage was admitted as an expert in toxicology and testified that she analyzed the victim's blood sample. She stated that there was zero alcohol in the victim's blood. The blood sample did contain the chemical typically known as Xanax, a nervous system depressant, as well as Benadryl, which causes sedation, as well as Hydrocodone. Agent Bramlage testified that the presence of these drugs in the victim's system two days after ingestion indicated that a very large quantity of these drugs had been administered. Agent Bramlage noted that these sedation drugs were commonly known as "date rape drug[s]."

Based on this evidence, the jury convicted the Defendant of rape and coercion of a witness. Following a sentencing hearing, the trial court imposed a twelve-year sentence for the rape conviction and a consecutive four-year sentence for the coercion conviction, for a total effective sentence of sixteen years in the Tennessee Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his rape conviction and that the State committed prosecutorial misconduct during closing argument.

## A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for rape. He contends that the victim's testimony alone was not sufficient to prove a non-consensual encounter and that inconsistencies in her accounts of the incident should have prevented the jury from finding beyond a reasonable doubt that a rape had occurred. The State responds that the victim explicitly testified and reported to medical personnel that the Defendant raped her and that the proof is sufficient to sustain his conviction for rape. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the

theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Rape, which was charged to the jury as a lesser included offense of aggravated rape, requires proof of unlawful sexual penetration of a victim by the Defendant accomplished without the consent of the victim, and the Defendant knows or has reason to know at the time of the penetration that the victim did not consent.  T.C.A. § 39-13-503(a)(2) (2018).

The evidence presented at trial and viewed in the light most favorable to the State, was that the Defendant followed the victim into the bathroom at a house party and penetrated the victim without her consent.  There was significant physical evidence from which the jury could find that the victim was sexually penetrated and the victim testified that she did not consent.  The Defendant maintains that there was no evidence to support a non-consensual encounter other than the victim's testimony and statements, which he contends were inconsistent.  We note that any inconsistencies in the victim's statements or testimony or the physical evidence were within the province of the jury to credit or discredit and we will not second guess the jury's determination on appeal.  *See Cabbage*, 571 S.W.2d at 835.  The Defendant is not entitled to relief on this issue.

## B. Closing Argument

The Defendant also contends that the State committed prosecutorial misconduct when it called the Defendant a liar during closing argument.  He acknowledges that no

contemporaneous objection was made; however, the Defendant contends he is entitled to plain error relief because a clear and unequivocal rule of law has been breached because the prosecutor expressed a personal belief or opinion as to the truth or falsity of the evidence. The State replies that the Defendant has waived this issue by failing to contemporaneously object and has failed to establish plain error.

Initially, we stress that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument. A contemporaneous objection provides the trial court an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary. Additionally, defense counsel's failure to object contemporaneously will constitute a waiver of the issue on appeal. *See* Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief where party failed to take reasonably available action to prevent or nullify an error).

The record reflects that the Defendant raised this issue for the first time in his amended motion for new trial. In the motion, the Defendant argued as follows:

> That Defendant should be awarded a new trial based on prosecutorial misconduct upon inappropriate statements made during closing argument that were intended to inflame the jury and were unrelated in scope as it relates to the Defendant.

We are unable, however, to review the trial court's ruling in this matter because the Defendant failed to include the transcript from the motion for new trial hearing in the record on appeal. The Defendant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). The Defendant risks waiving the issues on appeal if an incomplete record is submitted to this court. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing *Smith v. State*, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); *Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

Waiver notwithstanding, because the defense failed to lodge timely objections to the prosecutor's arguments, our review is limited to the parameters of this court's discretionary plain error review. *See Banks*, 271 S.W.3d at 119. We will grant relief for plain error only when five prerequisites are met: "(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." *Id.* at 119-20. It is a defendant's burden to convince this court that plain error

exists, and we need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The State's closing argument emphasized and reiterated the victim's fear of the Defendant. Defense counsel responded that the victim was not afraid, but rather a consensual participant in the night's events. Defense counsel suggested that the fear the State had argued in closing was misplaced, stating, "That should scare the hell out of every person in this room, that one woman said that she was raped after my client had consensual sex with her at a party." Defense counsel then listed what he identified as lies told by the victim. Defense counsel attacked the victim's integrity, credibility, and morals, calling her a "liar" and explaining the rape charges were the result of a "bully" and "a woman scorned."

Defense counsel argued that this case was not about the victim's fear but about the victim's intentional intimidation of the Defendant. He told the jury that there was "nothing else" other than the victim's claim to support the allegation of rape. He stated that the victim was extorting the Defendant "with false allegations of rape" and asserted that the State's case was nothing more than "bells and whistles" and "smoke and mirrors". About the State's proof, defense counsel stated, "There's nothing else other [than] one woman's testimony, and that to me is just scary. That's the scariest thing I have ever heard." Defense counsel concluded by telling the jury that the Defendant has "been waiting so long" for the jury "to fix this." He urged the jury to "be the best part of this story."

In response, the prosecutor argued as follows:

You know what is scary in this case? Is that the Defense, the Defense Attorney and the defendant can literally stand in front of you and suggest that this case is smoke and mirrors. That's scary.
        . . . .
It's scary that we are in a world where a victim can be raped by more than one person, be threatened, be robbed, be coerced, be hated, be humiliated, have to testify in front of strangers and to tell you [all] of the details of what must be a nightmare. It is no wonder that we live in a world where victims are scared to come forward.

Because when the Defense could suggest that there is no forensic evidence in a case where you heard from three different expert witnesses, just look you right in the eye and say there's no forensic evidence. If he can look you in the eye and say that, what else is this man hiding[?] That ends right now. The Defendant raped her and we won't be bullied by him anymore. I will not stand here and let you be blown over by lies and false argument.

8

The prosecutor then recounted all the evidence that refuted the Defendant's assertion that there was no forensic evidence in this case. The prosecutor noted areas where the forensic evidence was inconsistent with the Defendant's statements and identified those inconsistencies as the Defendant's "lies." The prosecutor told the jury, "He's a liar. And let there be no mistake about that. That's a liar sitting right there at that table."

The prosecutor recounted portions of the Facebook messages between the Defendant and the victim. He identified one message from the Defendant that stated, "I didn't touch you." About this quote, the prosecutor argued, "Another lie. I didn't touch you. That is a lie. This is not even questionable. We know he touched her. His DNA, Ladies and Gentlemen, were removed from her vagina. Don't allow this to fool you." The prosecutor also characterized the victim's response to one of the Defendant's messages as "you are a liar" although those were not the literal words used.

Initially, we have no trouble concluding that the prosecution's repeated references to "lies" and calling the Defendant a "liar" were improper. It is unprofessional conduct for a prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978). The prosecutor's argument, to some extent, was an expression of his opinion about the proof and the guilt of the Defendant.

This court has admonished many times that closing arguments must be (1) temperate; (2) predicated on the evidence adduced at trial; and (3) pertinent to the issues. *See State v. Hatcher*, 310 S.W.3d 788, 813 (Tenn. 2010); *State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005); *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994); *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978); *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). Additionally, because a prosecutor's role is to seek justice rather than simply advocate, the State's prerogative during argument is more limited than that of other parties. *Thomas*, 158 S.W.3d at 413 . As the United States Supreme Court has recognized,

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods . . . as it is to use every legitimate means. . . .

9

*Berger v. United States*, 295 U.S. 78, 88 (1935). A prosecutor must therefore "refrain from argument designed to inflame the jury." *State v. Hall*, 976 S.W.2d 121, 158 (Tenn. 1998) (quoting *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

We will not, however, overturn a verdict on the basis of a prosecutor's improper argument unless the impropriety affected the verdict. *Sutton*, 562 S.W.2d at 823. In conducting this inquiry, we consider five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [trial] [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Taking these factors out of order, we first note that there were no specific curative measures taken by the trial court or the prosecution. While this would ordinarily weigh against the State, in this case, the defense must also bear some responsibility for failing to object during the prosecutor's argument, which limits our review to a plain error analysis. Combining the first and third factors, we observe that the prosecutor did not begin referring to "lies" until the rebuttal portion of closing argument. The trigger for the prosecutor's improper comments appears to have been the defense's reference to the State's case being "smoke and mirrors" and a vigorous attack on the victim's credibility. The defense portrayed the victim as a "scorned woman" who was extorting the Defendant with allegations of rape. In rebuttal closing argument, the prosecutor recalled the forensic evidence presented at trial. The prosecutor then segued into the evidence that supported dishonesty on the part of the defense and not the victim. Thus, the intent of the prosecutor appears to have been to strike back at defense argument. While the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel.

We review the fourth and fifth factors jointly. The strength of the State's case was very strong. The evidence against the Defendant included the victim's identification of the Defendant as the perpetrator, DNA evidence of the Defendant's sperm in the victim, evidence of Xanax in the victim's system consistent with her account of the events, the Defendant's admission in messages that oral sex occurred and the victim's physical injuries which were consistent with her testimony about the rape.

Considering the parties' arguments as a whole and the evidence adduced at trial, we conclude that the prosecution's references did not affect the jury's verdict. Because

10

the Defendant has not demonstrated that any of his substantial rights were adversely affected by the improper argument, he is not entitled to plain error relief on this basis.

In his brief, the Defendant also noted an instance where the prosecutor used profanity in closing argument to the jury. Our review of the record reveals that both the defense attorney and the prosecutor used profanity during closing argument. While zealous advocacy is both important and valued in our profession, it should be tempered with the professionalism and courtesy required of all attorneys by the Rules of Professional Conduct. *See* THE RULES OF PROFESSIONAL CONDUCT, RULE 8 (attorneys have the "obligation [to] zealously protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system."). In our view, the use of profanity to advocate a position is wholly unnecessary, uncivil, discourteous, and disrespectful to the jurors. This type of language is superfluous and its likely purpose is an attempt to inflame the jury. Whereas, we do not believe, given the weight of the evidence, the use of profanity requires reversal in this case, we caution attorneys, consistent with our rules of professional conduct, to be temperate and professional in their argument. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE